Councilor for Appellants, are you ready to proceed? I am, Your Honor. Okay, go ahead. Thank you, Your Honor. And good morning, panel members. My name is Joe Pedraza, and I represent the Plaintiff Below Appellant Life Celebration Inc. And Your Honor, if I may reserve three minutes for rebuttal. Sure. Thank you, Your Honor. This appeal involves the duty to maintain premises, my client, Life Celebration sub-lease from Xerox. Now, how do we understand your position as to the origin of the duty and the scope of that duty, and where the scope of that duty is defined, if anywhere? Very good, Your Honor. First, I start with the premise that the district court accepted that there was a sub-lease between the parties, which makes sense because even Xerox concedes that for the last 14 years, my clients have occupied the premises in question, paid separate rent towards it, and there has been identification or reference to the lease in correspondence between the parties. The duty itself I would submit to the court is as follows. This lease started in 2007, October, 2007. And at that point, Xerox, the testimony from both Xerox and my clients is consistent on this point. Xerox purchased the ventilation system or the air conditioning system that he put on the premises. It then paid for the installation of that system. And from 2007 to the date of this argument, as we are having it here today, Xerox has retained the services of vendors to maintain and service the ventilation system for the entire 14 years that my client has been on those premises. Now, as I understand it, equipment, Your Honor, the issue here is not whether or not the ventilation system was working, but whether or not the ventilation system was maintaining a humidity sufficient to allow the printers to function properly, which is, to me, a very different question, it seems. Well, if I may, Your Honor, it's really a melded, your question melds into the circumstances. Right. Because in 2014 and 2015, apparently Xerox had changed over the vendor from a well-known national vendor who maintained and serviced the ventilations to an organization known as DMN, which is that direct mail of Maine, unbeknownst to my client. It's at that point that my client begins experiencing problems with the humidity in their premises, not knowing it's humidity related, but they're constantly calling Xerox to come in to service the iGen because it's a sophisticated piece of equipment sensitive to humidity. Services- Is anything in that property other than, at least the part of the property that you lease, anything then this printer, I just Googled, it looks like a gigantic printer. It is huge. Is there anything else, people's offices or anything like that? Or is it just the printer, I assume, and workstations of the folks who need to be there? Maybe you don't need printers, paper, people, maybe you just input through a computer into this printer and you don't even need a human on site, but trying to find out who is there, who's physically there. The entire organization is physically present on the premises within this footprint of the subleased premises. That includes their officers, their employers, or excuse me, employees who are software techs who can design the product that is being ordered all over the country by various funeral homes for funeral homes. And at the time of the problem in this situation, 2014, 2015, there was one iGen, which is a large piece of equipment. It's sophisticated and it costs about a million dollars in total that was available to my client with technicians who have been trained and actually supplied by Xerox to run that piece of equipment to the specifications that are required. As you question regarding the district court's decision, district court enters summary judgment in favor of Xerox and against Life Celebration. And though it didn't decide whether the agreement was oral, memorialized in a writing, it did find that under either theory, Life Celebration fails to point to any evidence, I'm reading from the district court decision, any evidence demonstrating even an inference that the contractual obligation that it relies upon was ever agreed to by the parties. And my response to that, your honor, is we did present evidence to the district court. And that evidence was that there was no dispute between the parties that from day one that the premises were occupied by Life Celebration, the air conditioning and the humidity in the premises was controlled by Xerox. And Xerox would maintain, service it for 14 years. And that in point of fact- That's what bothers me there, because again, I assumed that this thing was working. It just was not producing a sufficient humidity level to allow this printer to function. And that's, and I am melding, you're right about that, melting the issues and the facts together, but it's not so simple as to say that they had to maintain it. You're arguing specifically had to maintain it to a certain level of efficiency insofar as the humidity is concerned. And if I may address that, your honor, in a typical situation between Xerox and a customer, Xerox will lease the iGen. And in one of the conditions for leasing that iGen, the customer says, we will provide premises which comply with all of the environmental needs of this piece of equipment, because it is a very specialized piece. In this situation, my client being a small operation didn't have its own separate premises in order to make that representation at Xerox. So the individual, and you've seen his name, Mr. McGordy, said to my client, well, we have, we Xerox have a facility where we can carve out a place for your business. We can supply and meet all of the environmental conditions that are needed for this piece of equipment. Now you said environmental, where was that undertaking conveyed or communicated? Well, it's oral. And that's why it's based on the representations of Mr. McGordy. What specific representations? And that's what I'm struggling with. Could you identify what specific representations in the record represent this oral agreement? Because Judge Prater found there were none. Well, I understand that. And if I may, your honor, I believe if you take a look at the appendix at 166, where Mr. McGordy testifies that it was Xerox which purchased the air conditioning unit for the premises when the sublease started, it was Xerox which installed it. And Mr. McGordy said the reason they did that was in order for this equipment to be able to be used. Which volume of the appendix are you referring to? I have appendix 166, your honor. I think that may fall into the second series or the second. Are you reading when he was asked who had put the humidification system and that was missing here, correct? That's correct, your honor. And why did Xerox install it? Because that was part of the requirements for installation of the iGen proper humidification. Right, and what I'm suggesting to your honor when we were talking about that examination was what Mr. McGordy was saying is without environmental specifications met, the equipment can't be installed and it can't be used. So that's the oral contract. That's correct. And then Mr. McGordy is acknowledging that it was the responsibility of Xerox that was what I would call the hook that brought life celebration into pay the separate amount for the rent. And so does this come under the master service agreement? It does not. It does not. So this is outside of the master service agreement. That's our position, your honor. And in fact, but I will say Xerox takes a different position. But I think if I may- Well, if it's outside, let me ask you this. If it's outside the master service agreement, was any consideration paid by your client for this extra service? Yes, sir. It's $4,000 a month. And before that, there was a smaller footprint. So they paid a little bit less, but they paid rent every month to Xerox for the premises separate from the equipment lease. So that is a consideration. And it is Xerox who is providing the environment that's needed for their equipment. Well, who best but Xerox to know what it needs? A $4,000 monthly payment was rented. Is that accurate? Is that what you're saying? I'm sorry, your honor. I didn't pick that up. The $4,000 monthly payment was specifically for rent rather than use of equipment. That's correct, your honor. It is separate and distinct from the cost and expense for the equipment. The equipment is multi-millions of dollars. When you take that into account, the rent is the premises and the environment to be used to use that equipment because it is so sensitive to environmental needs. And- So rent was outside of the master service agreement, correct? That's correct. That is correct, your honor. Now, when payment was made, it's made, as I understand it, perhaps as a collective or aggregate payment. But even Xerox's documents indicate that the sub-lease, the rent $4,000 is separate and distinct from the equipment. And here's a point to specify. Your honor, there's the first MSO. That's the master service order in 2007. The court can find that at the appendix 133 and 134. That first MSO makes no reference whatsoever to premises. It's solely equipment driven. That MSO was in place for five years, but yet during the five-year period, it is Xerox who paid for the air conditioning, the system, paid for it to be installed, and then paid for it to be repaired and maintained over that five-year period. My point is, if the MSO, which gets you to the MSA, if that route actually existed, then the lease would have been specified in the MSO. It's not. Did Xerox charge you folks, your clients, anything extra when they put the humidifiers in? Or was that part of it? So they, from your perspective, they saw that as part of the deal. That's correct, your honor, yes. They didn't pay extra for that fix. That's correct. And for the last 14 years, when there's been a problem with the system, as Judge McKee was saying, Xerox is supposed to, for the overall facility, twice a year have a HVAC company come in and look at all of the HVAC systems and make sure they work. The reason is, Xerox is using the other areas of the premises with IGENTS, but also have an environmental need. So what happened, Judge McKee, they, Xerox, retained the national company with HVAC to do it. That changed over in 2014 to a new vendor. We believe and suspect, although it's difficult, I think we get a reasonable inference, is that that new vendor fumbled, dropped the ball. And it's at that time, because we can superimpose when the transition went from contractor one to contractor two, it's in 2014. That's when we have Life Celebration reporting to Xerox major problems with the IGENT, including breakdowns, which was influencing and impacting their business. That continues in 2015, because the service techs are treating the symptom, not the cause. Well, that's the problem. At that point, they didn't seem to, no one seemed to understand what was causing this thing to break down. They came in and tried to address the machine that give you a serviceable and a functioning machine. But they weren't aware at that point that the issue was environmental and not electronic or mechanical. That is correct, Your Honor. But here's what happened then in 2016, when the solution is, geez, Life Celebration, we can't figure out what to do. You have the one IGENT. Why don't we do this? Let's upgrade you to our next model. Let's put a secondary unit in, in case there was a breakdown or a problem with that first unit. And Life Celebration said, look, we're desperate. We'll do it. At that point, Xerox personnel come in, and in order to put the two pieces of equipment in, because they're expensive, they do an all out evaluation of the environment. It's at that time that they don't, they find not only is the environment insufficient and substantially insufficient, but that the ventilation system has been cannibalized. It's gone. Parts are gone. It's not functioning that serves that premises. So sometime in, we believe, 2014, up until the discovery in 2016, somebody removed the parts for that ventilation system, which then in turn leads to the problems that my client has from 2014 to 2015. The question is, since Xerox is responsible for not only repairing, but also maintaining and making sure that humidity is at the right level throughout the entire term of this sublease, why wasn't it discovered before, if in fact Xerox is performing the service of at least periodically having somebody take a look at the system and see what's going on? And you say, sir, that it was Xerox's obligation and duty to maintain adequate, to provide adequate maintenance at all times. Is that accurate? That's correct, your honor. Did you VAC maintenance? That's correct, your honor. But you don't have a writing or a contract in that regard. Well, unfortunately, your honor, we wouldn't be here today if I did, but no, the answer to your question is there is nothing specifically in writing. It's the custom and practices of the clients which show that it's been Xerox dominated from day one to this argument here today. The fact that there is no question there was a sublease between the parties. And as we understand at least the flight systems cases and the progeny of flight systems and Pennsylvania law, the parties can then orally fill in the responsibilities and obligations and it's for a jury to decide. Two things, one, help me understand the operation of the merger clause. And two, I thought there was provision, I think in the MSA, where if it comes to the attention of your client at some point in time, that some part of the property is inadequate or in need of repair or servicing, you have an obligation to give Xerox notice of that defect and they have 10 days to remedy it. Am I wrong about that? You're not, your honor. In fact, that's a very precise reading of the MSA. Let me first say that I would like to do my rebuttal because the MSA does not apply here. And I'd like to address that to the panel because it's an important issue. But let's take the latter observation that your honor just gave about the agreement. The 10, the notification was constantly being provided by my client who did not know that there was a problem with a cannibalized ventilation system. But they kept calling Xerox repeatedly, almost daily. Even Mr. McGordy of Xerox says, we were getting constant reports, their contact from life celebration saying, they can't use the equipment. We don't know what the problem is. We were temporarily putting gum in there to make the thing work, but it's failing and it's interfering with their business. That's what leads to the 2016 swap of two machines versus one. So I would submit to the court that whatever notification was required was met through the period of 2014 up to 2016 when the cannibalized system was discovered. I just have to give my eyes a written notice though. In the other instruction, why not put this in the lease? These are two sophisticated entities and you may argue and you may well be right about that, that compared to Xerox, we're talking about David and Goliath here and I'm not gonna argue with that. But nevertheless, we're talking about two commercially involved entities and in that sense, sophisticated entities represented by counsel. You know, my goodness, why not just stick a clause into the MSO or the MSA saying that, especially given the amount of money you're paying to this damn thing that Xerox undertakes to ensure that the environment in which the machine is functioning is sufficient to allow the machine to function properly? Because you're kind of arguing a warranty of merchantability. Well, I'm not sure that I am, Your Honor. I think that we really do have an oral sublease based upon the documents that have been sufficient to establish that and then the party's testimony itself, as I said, the Xerox personnel are consistent with the life celebration personnel of the relationship and how it unfolded with respect to the premises and maintenance of the premises. Let me go back to this oral sublease. Would an oral sublease be recognized under the MSA? Well, under the MSA? If the MSA applied? The answer would be no. I would have to defer and probably concede that point. Yes, Your Honor. That's my problem with the merger clause. Yeah, and earlier you said the MSA doesn't apply. How is it the MSA doesn't apply? Well, first, the relationship started out with the MS, the first MSO, which gets you to the MSA in 2007, makes no reference to the leased premises. So it is not then tethered to the MSA. We say that at that point, there was an oral lease that was separate and distinct from the equipment rental. Second, while the 2012 has a reference to a very passing reference, just says sublease 3,000 square feet. There was no other clarification of what that means. Nothing. And there's an ambiguity at a minimum. But look what happens in 2012 when life celebration upgrades to another I-gen. It's Xerox who continues maintaining and repairing the premises. It's Xerox in 2016 that when the discovery of the cannibalized ventilation system is made, brings in a contractor, makes a temporary repair to restore humidity, and has the contractor repair it and pays for it. And to this date continues to service it. And a third point, that's, well, that was a contradictory of what Xerox is now trying to say. Xerox never said anything to life celebration, like, sorry, guys, we got an MSA. We have no responsibility to your premises at that point. They did it. And they continue to do so even to today. The MSO- But that's why Judge Estrepo asked about the separate consideration, because it may be a situation where no good deed goes unpunished. That if they did something  then you're arguing, well, you would hang them by their own batard because they went further than they had to to do something to help out the lessee. I wouldn't be that draconian, Your Honor, but, and I'm glad I don't have to go to that point. But I would say this. Well, look at the MSA. The MSA is constructed to deal with customers who provide their own separate premises from Xerox. In other words, when you look at it, it's essentially a UCC document. So that Xerox can go onto the premises of the customer in order to retrieve their equipment if no money is being paid. It's a document, the MSA, that has requirements in there that the parties come to reasonably work out when Xerox personnel can come to the customer's premises and do repairs to the extent as needed. What I'm saying is it presupposes customer possession of premises that will then be used for the IGEN. Xerox is not providing it, and the MSA does not envision that or address that. But you signed the document that didn't apply to the lessee, but it is a signed document and it does apply. I know maybe it wasn't tweaked to the extent that it should have been tweaked to take it from the general application that you're talking about to the specific application here, but nevertheless, the clauses in that document still govern, don't they? Well, an agreement doesn't govern, Your Honor, unless it deals with a subject matter. And even the integration merger clause says whatever the subject of this MSA is, it controls. I'm suggesting to this court that on its face and as a matter of law, the MSA does not apply to leased premises by Xerox to a customer. It doesn't envision that. And as a result of it, you don't get to the notice. You don't get to the limited liability provisions. You don't get to the integration. And by the way, as I understand, Third Circuit and Pennsylvania precedent in this area, the burden of showing that the subject matter applies and those clauses which are limiting rest with Xerox. So what I'm suggesting is it doesn't apply and it became an argument after litigation initiated, an imaginative and initiative argument, granted. But I think it's a nonsensical argument. If you really look at what Xerox is saying, they're saying, one, we don't owe a duty to life celebration regarding the premises because our MSA doesn't say anything and it doesn't apply to the premises. So it doesn't say anything. But then on the other hand, they're saying, well, but the integration clause and our limitation on damages and conflict of law selections, all of that applies because the MSA governs the premises. You can't have it both ways. It's taking a square peg and trying to ram it into a circle to try to escape the responsibility of what was separately owed to life celebration as their sub landlord. Let me ask you, your time is up and I just looking through the appendix just now, looking for page 166. I quickly came across, I hadn't focused on this before the argument. So this is a rough reading. The CED, the customer expectation document. And it appears on page six of that, that the customers informed that HPAC certification is required and that the equipment will not operate since it is essential to the system's ability to perform as expected. Xerox will not be able to resolve problems with the system otherwise. And that's in the right hand column under comments in the CED on page six. And why wouldn't that put the responsibility that you're arguing was on Xerox squarely on your shoulders? Well, it was squarely on our shoulders initially, but what happened in the negotiation back in 2007 with Mr. McGordy on behalf of Xerox and my officials was that life celebration said, we don't have the premises. And Xerox said, well, we do. So we will take that. We will, in other words, provide you with the premises which will be environmentally appropriate to run these equipments as we believe they need to be. So you will fulfill your obligation to us by us providing these premises. And nothing in any of the documents says something like insofar as anything to the contrary may be represented, particularly in the customer service in the CED, it is not the undertaking or obligation of the customer here to certify the adequacy of the HVAC. That obligation remains on Xerox, notwithstanding what's specified in page six of the CED. Nothing like that exists anywhere. Well, if I may directly, the answer is nothing of that nature exists in writing. In writing, okay. I wish it did. But I also would like to make a couple of points on the point you're making, Judge. One, the fact that the customer signs that document tells you that it's outside the MSA. In other words, the customer is providing the premises and not Xerox. And Xerox protects itself by saying, well, this is expensive equipment. We want you now to certify what your premises are gonna do and that you will do HVAC and all the other stuff. Further illustration of what I would say is the lack of legitimacy in the argument of the MSO and MSA. Secondly, in this situation, we know that the premises were supplied to Life Celebration, not disputed. We know that the equipment requires specific humidification, not disputed. And we know that through Mr.- But when did you first find that out, the specific humidification? When was that first, at least in terms of what the record suggests, when was that first apparent to you? I'm sorry, which one, sir? When was that first made apparent to you? When did you first discover that specific humidification was required for this machine to function properly? Day number one. You can't get an iGen from Xerox without understanding that specific environmental conditions have to be met within ranges or the equipment. It not only won't operate, it potentially can be damaged. And Xerox faces the risk of damaged equipment of great value. So they are very particular about the environmental situation, which accounts for 2016, when Life Celebration, per Xerox's suggestion, upgraded to two iGens. You didn't see Xerox just come running into the premises and attach these new iGens. No, they did a full-blown workup of the premises, including the critical element of humidity, before they would put these very expensive pieces of equipment in that could be exposed to possible damage. And- Reduce to its essence. Reduce to it. What question, if we were to send this back, what question would the jury have to answer? Well, that's a very good question. I think the, well, initially, it depends upon the nature of the remand, I would suggest, because there are other issues that are still open for the district court, such as the MSO, MSA, how it interacts. It's a boilerplate document. Does it get interpreted against Xerox? I mean, there's a lot of issues that have been briefed before the district court that are still needing to be resolved. Yeah, the issue in front of us, with respect to the argument you're making right now, what question would the jury have to answer? What question? What duty was owed by Xerox to Life Celebration to maintain the premises with respect to humidity that Life Celebration contends through the course and custom as well as the other factual and testimony of Xerox? It was Xerox's responsibility, which they failed to do. Xerox is arguing that there are agreements that are in place that absolve them of that responsibility and that duty. And that becomes a factual question of what was the party's intent with respect to the sublease? Okay. That's what I would recommend, Your Honor. When you say agreements in place, you're referring to verbal commitments as opposed to written agreements? Yes, I'm accepting an agreement with the district court that everybody accepts that there's a sublease in place here. The question then becomes, what I would respectfully submit to the panel, it becomes then in an oral sublease situation, Pennsylvania law allows parole evidence to come in to define what did the parties intend. As you can see, Xerox is going to give a diametrically opposed view from our view. And that then becomes, I would respectfully submit to the judges, a decision for the jury to decide which one do they really believe defines the ultimate relationship with respect to maintenance of the humidity on the premises. Thank you. Okay, thank you. You've gone over quite a bit, so unless my colleagues have questions, let's hear from Mr. Sears. May I please, the court- Before, by the way, Mr. Pagliuzzi went over. I'm not blaming you for that because we kept asking you questions. I appreciate that, Your Honor. Thank you. Mr. Sears? Thank you, Your Honor. May I please the court, Tony Sears for Xerox Corporation. I wanna get back to the overarching theme. There are a number of things mentioned there that I'll try to get to that are not, frankly, in the record or supported by the record. But what is clear from the record is that there's no provision in any alleged contract that's been cited in the record that imposes any obligation on Xerox with respect to environmental controls or humidification in this facility. It absolutely does not exist, written, oral, otherwise. There's no evidence of it. The contracts that govern during this time period, it was the 2012 MSO. That 2012 MSO incorporates provisions of the MSA. The MSA is a master agreement. It doesn't set forth everything. It lists a non-exclusive, it specifically says including but not limited to, different types of services that could be provided. And this facility was gonna be provided under that provision. And the 2012 MSO specifically references the equipment to be provided and the facility to be provided. It doesn't say anything else. It doesn't say any duties about Xerox is going to maintain environmental controls. Well, but if Xerox provides them with equipment, knowing that in order for this equipment to function as it is supposed to, it has to have a certain level of humidity, isn't there some obligation on the part of Xerox in providing them, it is almost tantamount to a warranty of merchantability, to give them something that's gonna work. And that if they don't give them something that's gonna work, you'd agree that that's a breach on the part of Xerox. Well, if something is going to work and Xerox includes the concept of the environment necessary for it to function in, why isn't that subsumed within the understanding of the sublease? Well, two very important reasons off the bat. Number one is the merger provision. But secondly, and most importantly, is something that your honor mentioned earlier, and it's in the record at page 195 of the appendix. And it's a customer expectations agreement that Life Celebrations executed seven days after it executed the 2012 MSO. That's the CED that I referred to. Yes, and this is the formal agreement that the CED is a very big document. And this is the formal agreement where Life Celebrations says, and again, what's important, or it's important to look at the dates of these. The 2012 MSO was signed by Mr. Givnish on June 6, 2012. Eight days later on June 14, 2012, he signs the customer expectations agreement. That is the only document in the record that addresses anyone's obligation to address humidification, environmental controls, et cetera. And it specifically says, I, Life Celebrations, am responsible for environmental controls and HVAC certifications. And it refers to that customer expectations document that Judge McKee was referencing that has all kinds of requirements in it. And so they accepted the responsibility right here. It's right there. How do you reconcile that with counsel's argument that there was this oral agreement at page 166 of the appendix? There is no oral agreement. Where are the terms of the oral agreement? To have an oral agreement, the Pennsylvania courts have said, to have an oral agreement, you've got to have the same elements that you would have to have for a written agreement. I cited the Schreiber v. Olin Mills. Where's the offer, the acceptance, and the consideration? There was no, there's no evidence in the record because it's frankly just not true that there was an addition of $4,000 outside of the MSO. The $4,000, they did pay $4,000 of rent, but it's included in the 2012 MSO. There's absolutely nothing in the record to contradict that. It doesn't exist because it didn't happen. It was all in the MSA and the MSO. And that's why Life Celebration wants to talk about an oral sublease because it's not in there. It doesn't exist. And in fact, they signed the agreement at page 195 saying that they're responsible for the environmental controls. So what are they trying to do? They're trying to rely on an oral sublease that's not enforceable for a dozen reasons. The merger provision, there's no allegation that anyone from Xerox with the authority to contract. Mr. McGroarty said, I don't do contracts. I'm not involved in the contracts. I don't have that authority. He specifically testified to that. He didn't say that he got to a meeting of the minds with Life Celebration about this purported obligation. There is testimony that Xerox installed a humidification system, but they were in the building since 1999. That's in the record before Life Celebration was even formed. So to claim that that somehow was for them and they did it at that time, that's not in the record. It's frankly false. It's not true. But we can't have an oral sublease here that's enforceable. Let's talk about the statute of frauds. They're coming into court and saying there's a 66-month term sublease of oral property that's enforceable. The Pennsylvania statute of frauds, this court's decision in the Landon-Ballmark case we cited says that cannot be. You have to have a writing. And the cases that they've cited on that actually reinforce the fact that you've got to have a writing. They cited the Birka State case. There was a will. That was the writing. They cited the Kyle case, K-E-I-L. There was a deed that constituted the writing. They cited this court's decision in flight systems. What the court did in flight systems, as you said to the district court, you shouldn't have dismissed this at the 12B6 stage because the plaintiff might be able to come forward with a writing that satisfies the statute of frauds. What Life Celebration didn't cite was the subsequent history of that case. The plaintiff couldn't come forward with a writing. So what ended up happening was the district court granted summary judgment and this court affirmed. And that's the same situation we're in here. There's no writing that they can point to that imposes this obligation. And again, there's no enforceable oral agreement. Well, Mr. Sears, can a course of conduct add a term to a fully incorporated agreement? No, not where they're, number one, not where there's a merger agreement. Number two, there would have to be, and this has never been raised ever in the briefing of the parties. To get to course of conduct, I think we'd have to point to a term and say, this term is ambiguous. Let's figure out what was intended. Let's look at the course of conduct. That's never been argued there. You can read their brief and their reply brief. There's no case law on that. They didn't raise it at the district court. So my answer would be no, there's no basis to do that. What they're trying to do is to create another agreement. And I think that's what Mr. Pedraza said. He's not trying to interpret the 2012 MSO and the incorporated provision to the MSA, much less the customer expectations agreement. He wants to create a new agreement from scratch that he says is separate, that just happens to address the exact same equipment and the exact same premises that are referenced in the 2012 MSO. We cited in our brief and in the record, the exact provision that addresses the subleased 3000 square feet net of common areas that's in that 2012 MSO. It's also false that it wasn't in the 2007 MSO that life celebration wasn't a party to. It specifically references a facility cost for a 60 month term in there. So it's right in the contract. I mean, I can, the 2007 MSO is in the record at starting at page 133. And as I said, it specifically references a facility cost and that's what was being provided. And they weren't out, let's be clear here. This wasn't a situation where Xerox is in, he's right. They're not in the business of going out and leasing real estate. They're providing a facility within which to operate this equipment. And that's all they were gonna do. The humidification is not a ventilation system, as Mr. Pedraza said. It's not a, although the HVAC certification was the obligation of life celebration. It's not an HVAC thing. It's humidity and certain times of the year the humidity changes and you have to have humidifiers and things like that. In fact, when this happened, they put some portable units by it, like portable humidifiers. So it's not like this thing services the entire building. There's also, I would say there's no evidence sufficient to establish a course of conduct. There's a couple of, if you go back and look at that testimony, there's just a couple of offhand comments about, well, at some point some contractor came in to check the system, but there's nothing about Xerox taking that obligation on or a schedule for that. It doesn't exist between these parties in writing or morally, there's no evidence of it. So as Judge Prater held, Xerox maintains that the MSO and the MSA government. Judge Prater didn't adopt that position. What the district court said was, I don't have to do that. I don't have to make that call because even if I accept the theory that there could be an oral sublease, and we submit there couldn't be under the statute of frauds and various other reasons, there's no evidence of a meeting of the minds of a exchange of consideration of a contract where Xerox agreed to take on that obligation. So there's nothing to go to the jury on unless the court has questions. I think we've covered all these, I think we've covered all these arguments in our papers. I would like to, like I said, refer back to the record which clarifies a number of these issues as well. Okay, thank you, Mr. Sears. If my colleagues have no questions, we'll hear back from Mr. Pedraza. Thank you, Your Honor. And I recognize I had quite a bit of time in the initial. So I only have three points to make. First off, I have to respectfully disagree with my opposing counsel about the reference in the 2007 that facility costs includes the lease. It in fact, it does not. If the court takes a look at the 2012 MSO that counsel really relies upon, and it's the appendix APPX 39, the court will see that with additional services, build out sublease and facility costs. Facility costs is separated from sublease. They are not the same thing and it does not cover it. In addition, there is a deposition by a gentleman by the name of Fox. He was shown an email, which unfortunately was accidentally not attached to the transcript. But his testimony is an email dated July 20, 2016 at 1226 PM. And in his testimony, Mr. Fox will reconfirm that a reference in his email, he references sublease 3,000 square feet, $4,000. Then he has build out $414, labor and management $12,773, facility costs $23. The facility costs is a very, very minor cost in the overall schemes, never exceeding the $23 that we're talking about in 2016 with Mr. Fox. It is not the lease. And I just wanted to correct that misperception if that was made in the argument by opposing counsel. My second point is the oral sublease. If you accept an oral sublease, which the court has, and frankly, counsel, my opposing counsel at summary judgment, it is not part of your appendix, but it's in your official record. It's an argument transcript of February 24, 2020 before the district court. It's on page 41 of the argument transcribed. The court asked opposing counsel about, are you going to continue to give the premises to life celebration through March of 2022? Opposing counsel says, that means we're contractually obligated to provide what we're supposed to provide, 3,000 square feet. And he continues on. The rule of an oral sublease is if it's accepted and acknowledged to exist, then parole evidence is brought in to define terms that are obviously not written down. I don't know how opposing counsel can go back on his word that there is a contract for the 3,000 square feet that he represented to the district court in order for the district court then to say that the coterminous issue is premature and dismissed. In addition- You have only about a minute left to just the merger clause. You said the merger clause doesn't apply. Why doesn't that apply? The merger clause, it specifically says subject to, meaning subject to the contents of the MSA. You have to then reach the conclusion that the MSA provisions reach to this sublease, which we say is separate and distinct. If it is separate and distinct, as we say, or it's a factual issue, then the merger clause and all the other clauses of the MSA fail. Remember, your honors, the MSA is an equipment-driven, maintenance-to-equipment document. It is not a premises-driven document. And I am respectfully submitting to your honors that Xerox is torturing the interpretation of that agreement to try to get the premises under the umbrella of that MSA, obviously for self-serving reasons. But if you look at the words itself, that MSA does not reach to premises. It does not have provisions on them. And finally, your honors, it's not just a little bit of testimony here and there. In our reply at pages 10 and pages 11 and 12, we lay out the testimony that was given by those who are actually on the premises since Life Celebration's been there from 2007 to today. And it starts from day one that Mr. McGordy specifically said that for the premise areas, which by the way, it's built out. It's not like an open hangar where Life Celebration works. It's an enclosed separate area for their operations. Mr. McGordy said from day one, a new humidification system or an equipment was brought in at Xerox's expense, an installation at Xerox's expense in order to deal with the humidity needs for the premises of that part of the hangar or larger area that Xerox is using. It was not that the Life Celebration is just simply getting the ventilation system that was already in place or that Xerox somehow did a premises-wide ventilation. It was specifically targeted to the ventilation for the premises that Life Celebration occupies. And unless your honors have other questions, I think I've probably used up more time than I deserve. At least you're consistent, Mr. Pedraza. And I thank the court for the opportunity to present argument. Okay, I'd like to, unless you have any questions, Julio or Phil, I'd like to get a transcript of the argument elsewhere and you can split the costs of that and Patrick can explain that process if you're not familiar with it. Take just a very brief break and then we'll hear the next case. Take the matter under advisement. Thank you.